UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| E.D.H, a minor, <br> by and through her NEXT FRIEND <br> MEGHAN HERNANDEZ, <br> <br>           Plaintiff, <br> v. <br> <br> LEAVENWORTH COUNTY, a political <br> subdivision of the State of Kansas; <br> HOUSECALLS OF KANSAS LLC d/b/a/ <br> SYNERGY COMPLETE HEALTHCARE, a <br> Kansas domestic professional limited liability <br> company; DEPUTY ALEX LEINTZ, <br> individually; OFFICER DOUTHITT, first <br> name unknown, individually; OFFICER <br> SCHNEIDER, first name unknown, <br> individually; and MELISSA WARDROP, LPN, <br> individually, <br> <br>           Defendants. | ) <br> ) <br> ) <br> ) <br> ) Case No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

1. Meghan Hernandez is the adoptive parent and guardian of E.D.H., a minor child. Meghan Hernandez and E.D.H. are United States and Missouri citizens who reside in Kansas City, Clay County, Missouri.

2. E.D.H. is the natural child and heir at law of Raquel Lynn Saldivar, who died on May 23, 2023 in Leavenworth County, Kansas.

3. Raquel Lynn Saldivar died a wrongful death under the custody and care of Leavenworth County and its agents and/or employees who were acting under color of state law at and before Ms. Saldivar's wrongful death.

4. On May 20, 2023, Ms. Saldivar was taken into custody in the Leavenworth County Jail on an outstanding warrant for neglecting to register her dog with the County.

5. Ms. Saldivar thereafter suffered from the effects of opioid withdrawal that were ignored by Defendants in violation of Ms. Saldivar's constitutional rights.

6. In the final hours of her life, Ms. Saldivar visibly lost consciousness in front of three correctional officers. Yet, she was deposited onto the floor of her cell without any additional medical attention.

7. Pretrial detainees have a constitutional right to adequate medical care. This action, brought under 42 U.S.C. § 1983, seeks damages for Defendants' unconstitutional acts that caused Ms. Saldivar's wrongful death.

**Defendant Parties**

8. Leavenworth County is a governmental entity and political subdivision of the State of Kansas responsible for operating Leavenworth County Jail. At all times relevant to this Complaint, Leavenworth County, through its employees, agents and/or contractors, acted under color of state law. Leavenworth County owed Ms. Saldivar and other detainees at the Leavenworth County Jail a non-delegable duty of care to ensure they received constitutionally adequate medical care.

9. HouseCalls of Kansas, LLC d/b/a Synergy Complete Healthcare ("Synergy"), along with its subsidiaries, parent companies, employees, or agents acting on its behalf is a private, for-profit, correctional healthcare company organized as a limited liability corporation under the laws of Kansas. It is registered with the Kansas Secretary of State and is active and in good standing. Synergy contracted with Leavenworth County to provide medical services at Leavenworth County Jail. Through this contract and operations, Synergy assumed the public function of delivering healthcare services to inmates and detainees, thereby acting under color of state law.

10. Defendant Melissa Wardrop, LPN (hereinafter "Nurse Wardrop"), is a licensed practical nurse. Nurse Wardrop was employed by Leavenworth County and responsible for providing healthcare services to inmates and detainees at the Leavenworth County Jail. At all relevant times, Defendant Wardrop was acting within the scope of her employment under color of state law. Defendant Wardrop is sued in her individual capacity.

11. Defendant Deputy Alex Leintz (#498) was at all relevant times a correctional officer employed by Leavenworth County and responsible for inmates and detainees at the Leavenworth County Jail. At all relevant times, Deputy Leintz was acting within the scope of his employment and under color of state law. Deputy Leintz is sued in his individual capacity.

12. Defendant Officer Douthitt (#465), first name presently unknown, was at all relevant times a correctional officer employed by Leavenworth County and responsible for inmates and detainees at the Leavenworth County Jail. At all relevant times, Officer Douthitt was acting within the scope of his employment and under color of state law. Officer Douthitt is sued in his individual capacity.

13. Defendant Officer Schneider (#486), first name presently unknown, was at all relevant times a correctional officer employed by Leavenworth County and responsible for inmates and detainees at the Leavenworth County Jail. At all relevant times, Officer Schneider was acting within the scope of his employment and under color of state law. Officer Schneider is sued in his individual capacity.

14. Nurse Wardrop, Deputy Leintz, Officer Douthitt, and Officer Schneider, are collectively referred to in this Complaint as "Individual Defendants."

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C § 1331.

16. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

A. **Ms. Saldivar is detained for a nonviolent misdemeanor offense.**

17. In the early morning hours of May 20, 2023, Ms. Saldivar was arrested on a misdemeanor warrant for failing to appear in municipal court.

18. The underlying proceeding in which Ms. Saldivar failed to appear involved failure to register her dog.

| Case | Role | Status | Judge | | |
|---|---|---|---|---|---|
| AC-2019-0000068 | Defendant | Closed | Fuller, Gary L | | |
| Charge | | Violation Date | Finding Date | Finding | |
| CITY TAGS REG'D #1 | | 04/03/2019 | 05/23/2019 | G | |
| ANIMAL RUNNING AT LARGE | | 04/03/2019 | 05/23/2019 | G | |
| PROOF OF VACCINATION | | 04/03/2019 | 05/23/2019 | G | |

19. Ms. Saldivar was transported and booked into Leavenworth County Jail, where she remained until her wrongful death.

20. After arrest, Ms. Saldivar remained confined at Leavenworth County Jail and became too sick to eat, drink water, urinate, or cease vomiting. She suffered from severe abdominal pain and spent significant time curled up on the floor of her cell in a fetal position, moaning in agony.

B. **Ms. Saldivar's first visit to the medical unit.**

21. Despite Ms. Saldivar's clear distress, the agents and employees at Leavenworth County Jail failed to help her.

4

22. On May 22, 2023, around 10:00 am, Ms. Saldivar approached the medical unit where Nurse Wardrop was stationed. This encounter is documented in body-worn camera footage.

23. Ms. Saldivar informed Nurse Wardrop that she was experiencing opioid withdrawal and had used heroin about three days earlier.

24. Nurse Wardrop asked Ms. Saldivar to provide a urine sample so that she could do a "drug screen UA," but Ms. Saldivar was too dehydrated to do so.

25. Because all medical units were full, Nurse Wardrop did not keep Ms. Saldivar in a medical unit cell for observation.

26. Instead, she sent Ms. Saldivar back to her cell with some Tylenol and told her to come back once she was able to drink water and urinate.

> Medical Assessment: Request drug screen prompt. Pt reports sweating and cramping. Pt sent back to drink water in order to complete drug screen. Pt has been made aware awaiting drug screen to call the provider.
> Treatment Plan: Spoke to Brandy about getting a UA then call for further orders.

27. Nurse Wardrop failed to involve a medical doctor or higher-level provider, failed to arrange for hospital transport, and failed to take other action to assist or monitor Ms. Saldivar.

**C.    Ms. Saldivar's second visit to the medical unit.**

28. Ms. Saldivar continued to experience the excruciating effects of opiate withdrawal for the next thirteen hours.

29. Around 11:00 pm on May 22, 2023, Ms. Saldivar's vomiting got the attention of correctional officers.

5

30. Officers Douthitt and Schneider went to check on Ms. Saldivar, who informed the officers that she was withdrawing from heroin.

31. Officers Douthitt and Schneider decided to take Ms. Saldivar to the medical unit for another medical evaluation. On the way there, the two were joined by Deputy Leintz.

32. Body-worn-camera video footage captures their trip to the medical unit.

33. Ms. Saldivar struggled to walk, leaned up against the wall, and grabbed her chest, repeatedly saying, "I can't breathe."

34. By the end of the short walk from her cell to the medical unit, Ms. Saldivar could no longer walk on her own.

35. Officer Schneider and Deputy Leintz had to carry Ms. Saldivar into the medical unit.

36. Once inside, Officer Schneider and Deputy Leintz placed Ms. Ms. Saldivar into a chair. She slumped into the chair and appeared to lose consciousness.



37. The officers attempted to get a reading of Ms. Saldivar's blood pressure, a key component of any medical evaluation. But they failed to successfully do so, apparently untrained in how to properly fit a blood pressure cuff or completely lacking one the correct size.

38. Deputy Schneider called Nurse Wardrop on the telephone to explain Ms. Saldivar's rapidly deteriorating condition.

39. Nurse Wardrop wrongly stated that Ms. Saldivar had "refused" to provide a urine sample earlier in the day.

40. Nurse Wardrop told the officers to return Ms. Saldivar to her cell since no medical cell was available. Nurse Wardrop said she would check on Ms. Saldivar when Nurse Wardrop reported to the Leavenworth County Jail the next morning.

41. Nurse Wardrop, Officer Douthitt, Officer Schneider, and Deputy Leintz did not request further medical care for Ms. Saldivar, did not perform any lifesaving measures, and did not call an ambulance, despite Ms. Saldivar's obvious loss of consciousness, change in breathing patterns, and their inability to get a blood pressure reading.

42. Officer Douthitt, Officer Schneider, and Deputy Leintz then placed Ms. Saldivar—who was no longer capable of moving under her own power—in a wheelchair and returned her to her cell. Throughout the return trip, Ms. Saldivar gasped for air with her head flung backwards over the back edge of the wheelchair.



43. After wheeling Ms. Saldivar back to her cell, the officers dropped Ms. Saldivar onto the mattress on the floor of her cell and tossed her shoes in after her.

7

**D.     Ms. Saldivar dies hours after the second visit to the medical unit.**

44.     After returning Ms. Saldivar to her cell, Officer Douthitt attempted to contact Nurse Wardrop about whether Ms. Saldivar should remain in her cell.

45.     Nurse Wardrop failed to answer the phone and there were no other attempts to reach medically trained personnel on site at the Leavenworth County Jail.

46.     Neither Officer Douthitt, Officer Schneider, nor Deputy Leintz attempted to contact a medical doctor or any other higher-level provider to consult about Ms. Saldivar's symptoms, given Nurse Wardrop's unavailability.

47.     Individual Defendants did not call for an ambulance or arrange for transportation to a hospital, despite Ms. Saldivar's ongoing and obvious loss of consciousness.

48.     Individual Defendants took no adequate steps to care for Ms. Saldivar, despite her obvious and serious medical distress.

49.     According to a law enforcement report, Ms. Saldivar was "breathing and moved her hand" around midnight on or about May 22, 2023.

50.     According to a law enforcement report, Ms. Saldivar was "breathing and awake" around 1:30 am on May 23, 2023.

51.     Ms. Saldivar was found "not responsive" at 2:10 a.m. on May 23, 2023.

52.     At that time, correctional officers administered Narcan twice and attempted CPR, but Ms. Saldivar was declared dead the moment EMS finally arrived at 2:31 am on May 23, 2023.

53.     Ms. Saldivar's opioid withdrawal condition was treatable.

54.     Ms. Saldivar's wrongful death was preventable.

55.     Defendants, through their actions and omissions, caused Raquel Lynn Salvidar's wrongful death.

56.     At all relevant times, the Individual Defendants acted with wanton and callous disregard for Ms. Saldivar.

**E.      Ms. Saldivar's need for medically-managed withdrawal was a foreseeable—and foreseen—result of the opioid epidemic.**

57.     Due to the American opioid epidemic, it is foreseeable that detainees will require care for opioid withdrawal and therefore essential for jails to have policies, practices, and procedures designed to safely monitor and treat opiate withdrawal.

58.     It is equally crucial that jails and their contractors provide adequate training and supervision to all employees who interact with detainees on how to safely manage opiate withdrawal, because many detainees will foreseeably suffer from withdrawal after their admission to jail facilities.

59.     More than a year before Ms. Saldivar's death, the United States Bureau of Justice Assistance issued a publication titled "Managing Substance Withdrawal in Jails: A Legal Brief."[1] An entire section of that publication addresses the "importance of withdrawal management in jail," observing that death (and resulting liability) can follow from the lack of properly managed withdrawal.

60.     In a facility like Leavenworth County Jail where opioid withdrawal and other medical crises are foreseeable, proper training and protocols are a constitutional necessity.

**F.      Leavenworth County's Contract with Synergy.**

61.     At the time of Ms. Saldivar's death, Leavenworth County contracted with Synergy to provide medical services and oversight for detainees housed at the Leavenworth County Jail.

---

[1] Bureau of Justice Assistance, *Managing Substance Withdrawal in Jails: A Legal Brief* https://bja.ojp.gov/doc/managing-substance-withdrawal-in-jails.pdf (Feb. 2022).

62. Leavenworth County and Synergy engaged in a joint venture and worked in concert with one another to provide medical care to the inmates and detainees at the Leavenworth County Jail.

63. The agreement between Leavenworth County and Synergy (the "Contract") sets forth Synergy's obligations regarding the provision of medical care within Leavenworth County Jail, including staffing requirements, treatment protocols, and emergency response procedures.

64. Under the Contract, Synergy assumed responsibility for instructing and overseeing nursing staff at Leavenworth County Jail.

65. Under the Contract, Synergy assumed responsibility for the development, updating, and training of medical protocols used by nursing and correctional staff to care for detainees at Leavenworth County Jail.

66. Pursuant to the Contract, Synergy was obligated to be available by phone to nursing and detention staff 24 hours per day, 7 days per week, 365 days per year.

67. Pursuant to the Contract, Synergy assumed responsibility for the care and treatment of detainees who are intended third-party beneficiaries of such contract at Leavenworth County Jail, including Ms. Saldivar.

68. In fulfilling the contract, Synergy acted under color of state law.

**G.    Leavenworth County & Synergy were responsible for providing adequate medical care to Ms. Saldivar and failed to do so.**

69. Leavenworth County oversees the operation of the Leavenworth County Jail, a facility located in Leavenworth, Kansas, which houses individuals awaiting trial on criminal charges as well as those serving sentences following conviction.

70. Upon information and belief, the average daily population of Leavenworth County Jail is 630 inmates, with females comprising roughly 18% of the total population.

10

71. Leavenworth County is directly responsible for the housing, custody, and safekeeping of all detainees at Leavenworth County Jail.

72. As such, Leavenworth County has a non-delegable duty to provide detainees at the Leavenworth County Jail with access to medical care reasonably designed to meet the routine and emergency health care needs of inmates, including treatment for inmates' physical illnesses, dental issues, and psychological or psychiatric conditions.

73. This includes, but is not limited to, establishing, implementing, and enforcing adequate policies and procedures, and training staff and employees in addressing opioid withdrawal and medical emergencies.

74. Leavenworth County contracted with Synergy to provide medical services and oversight to nursing staff for inmates housed at the Leavenworth County Jail, including Ms. Saldivar.

75. Under the non-delegable duty doctrine, unconstitutional acts and omissions of Synergy and its employees in carrying out its contractual obligation to provide adequate medical care to pretrial detainees at the Leavenworth County Jail are imputed to and become those of Leavenworth County.

76. Defendants Leavenworth County and Synergy maintained and enforced deficient policies, practices, and customs that exposed detainees to significant risks of harm.

77. Defendants Leavenworth County and Synergy unreasonably relied on untrained employees—lacking the necessary medical qualifications, skills, or experience—to monitor detainees with serious medical needs.

78.  Similarly, Defendants Leavenworth County and Synergy failed to supervise medical personnel who were inadequately trained and failed to fulfill their duties as healthcare providers.

79.  Defendants Leavenworth County and Synergy's systemic deficiencies included but are not limited to:

a) Inadequate policies and procedures for identifying and responding to urgent medical needs, including failing to transport detainees requiring higher-level care to a hospital;

b) A pattern of neglect and substandard treatment for detainees with serious opioid withdrawal medical conditions;

c) Failure to ensure that correctional officers, nurses, and other medical personnel fulfilled their gatekeeping role by escalating acute medical cases to higher-level providers and facilitating appropriate medical evaluations and treatment;

d) Ineffective communication protocols between healthcare providers and correctional officers regarding detainees' urgent medical needs;

e) Failure to train correctional officers, nurses, and other medical personnel on how to assess, monitor, and manage opiate withdrawal and acute medical crises;

f) Failure to monitor and enforce compliance with constitutional standards for medical care.

80.  Defendant Leavenworth County had long been aware of systemic deficiencies in the provision of medical care at Leavenworth County Jail.[2] Despite this knowledge, Leavenworth County failed to implement necessary reforms, continuing to expose detainees to severe risks of harm.

81.  As a direct and proximate result of Leavenworth County's and Synergy's actions and omissions, E.D.H. has and will suffer mental anguish, suffering, bereavement, loss of

---

[2] *See, e.g.*, ACLU Letter to Sheriff Andrew Dedeke, available at https://www.aclukansas.org/sites/default/files/field_documents/letter_to_leavenworth_co_sheriff.pdf (last visited May 16, 2025).

12

society, companionship, comfort and protection of Raquel Lynn Saldivar, loss of attention, advice and counsel of Raquel Lynn Salvidar, and loss of parental care, training, guidance and education from Raquel Lynn Salvidar.

82. All acts and omissions by Leavenworth County and Synergy were carried out under color of state law.

**H.    Nurse Wardrop failed to provide adequate medical care to Ms. Saldivar.**

83. Defendant Melissa Wardrop, a licensed practical nurse assigned to work at Leavenworth County Jail, had actual knowledge that Ms. Saldivar was suffering from opioid withdrawal.

84. Ms. Saldivar reported this condition to Nurse Wardrop directly during the medical visit around 10:00 am on May 22, 2023, as seen on body-worn camera footage.

85. Officer Schneider informed Nurse Wardrop that Ms. Saldivar was still suffering from withdrawal around 11:30 pm on May 22, 2024.

86. Ms. Saldivar exhibited numerous alarming symptoms, including persistent vomiting, severe dehydration, and an inability to urinate.

87. Despite clear indications of a serious medical condition, Nurse Wardrop failed to take appropriate steps to address Ms. Saldivar's urgent medical needs or ensure she was monitored moving forward. A reasonable nurse would have recognized the life-threatening nature of Ms. Saldivar's condition and acted promptly to secure higher-level medical care. Such action could have included:

   a) Transporting Ms. Saldivar to a nearby emergency department;

   b) Asking a physician or higher-level medical provider to evaluate and treat Ms. Saldivar; or

   c) Seeking guidance from a medical doctor to aid Ms. Wardrop in assessing

Ms. Saldivar's condition.

88. As a gatekeeper for detainee medical care, Nurse Wardrop was obligated to escalate Ms. Saldivar's case to ensure she received evaluation, monitoring, and care necessary to address her serious condition.

89. Nurse Wardrop took no meaningful steps to mitigate Ms. Saldivar's suffering and the substantial risk of serious harm to Ms. Saldivar's health.

90. Nurse Wardrop, without seeking the advice or consultation of a higher-level medical provider, and without adequate monitoring in place, directed Ms. Saldivar to return to her cell at 10:00 am on May 22, 2023, and later that evening directed Leavenworth County Jail staff to return Ms. Saldivar to her cell again, despite Ms. Saldivar's deteriorating condition and her obvious distress.

91. Nurse Wardrop did not take basic steps to evaluate Ms. Saldivar's opiate withdrawal, such as completing the Leavenworth County Jail's "Opiate Withdrawal" protocol.

92. Nurse Wardrop failed to treat an obvious and serious and obvious medical condition.

93. Nurse Wardrop effectively denied care despite being presented with recognizing symptoms that potentially created a medical emergency.

94. Nurse Wardrop's response to Ms. Saldivar's medical condition was patently unreasonable.

95. Nurse Wardrop's decisions reflect wanton behavior and deliberate indifference to Ms. Saldivar's serious medical needs.

96. Nurse Wardrop's failure to take reasonable measures to mitigate these risks constituted reckless and callous disregard for Ms. Saldivar's constitutional rights.

97. As a direct result of Nurse Wardrop's deliberate indifference and failure to follow constitutionally required medical standards, Ms. Saldivar died.

98. All acts and omissions by Nurse Wardrop were carried out within the course and scope of her employment and under color of state law and demonstrated at least reckless disregard for Ms. Saldivar's Fourteenth Amendment rights.

I. **The Individual Defendants were deliberately indifferent to Ms. Saldivar's serious medical needs.**

99. The Individual Defendants failed to ensure that Ms. Saldivar received medical attention when she needed it, even after she lost consciousness in some of their presence.

100. Ms. Saldivar's loss of consciousness occurred against the backdrop of Ms. Saldivar's severe opioid withdrawal, a condition for which, on information and belief, these officers had actual knowledge.

101. Ms. Saldivar's increasingly severe pain, discomfort, and ultimate loss of consciousness were obvious signs of Ms. Saldivar's medical distress.

102. The inaction of the Individual Defendants in response to Ms. Saldivar's medical condition reflected a wanton and deliberate indifference to Ms. Saldivar's obvious medical needs, causing her wrongful death.

103. The actions and inaction of the Individual Defendants constituted reckless and callous disregard for Ms. Saldivar's constitutional rights.

104. All acts and omissions by the Individual Defendants were carried out under color of state law and demonstrated at least reckless disregard for Ms. Saldivar's Fourteenth Amendment rights.

105. As a direct result of all acts and omissions by the Individual Defendants, Ms. Saldivar died.

# CAUSES OF ACTION
## Count I
### Violation of 42 U.S.C. § 1983 – *Monell Liability*
### [against Leavenworth County and Synergy]

106. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

107. At the time of her death, Ms. Saldivar was a pretrial detainee in custody at the Leavenworth County Jail.

108. At all relevant times, Leavenworth County and Synergy acted under color of state law and were responsible for the implementation, enforcement, and supervision of policies, practices, and customs governing the provision of constitutionally adequate medical care to detainees at the Leavenworth County Jail.

109. Defendants Leavenworth County and Synergy owed a duty to provide detainees at Leavenworth County Jail, including Ms. Saldivar, with constitutionally adequate medical care that met the routine and emergency healthcare needs of detainees.

110. Defendants Leavenworth County and Synergy maintained and enforced unconstitutional policies, practices, and customs that resulted in the deprivation of Ms. Saldivar's rights. These included, but were not limited to:

   a) Failing to ensure that inmates with serious medical needs were transported to hospitals for higher-level care;

   b) Allowing unqualified or inadequately trained staff to assess, monitor, or neglect detainees with urgent opioid withdrawal medical conditions;

   c) Failing to adopt or enforce policies that ensured detainees received timely and adequate medical treatment, including specifically for opiate withdrawal;

   d) Allowing systemic healthcare deficiencies to persist despite prior notice of these risks; and

   e) Allowing such substantial failures as resulted in the injuries and death to Ms. Saldivar while under their care and custody.

111. Defendants Leavenworth County and Synergy further failed to adequately train and supervise personnel, which created an environment in which detainees' medical needs were neglected. Specific failures included:

   a) Insufficient training in recognizing and responding to serious opioid withdrawal medical conditions;

   b) Ineffective communication protocols between healthcare providers and correctional staff regarding detainees' urgent healthcare needs; and

   c) Failure to enforce constitutional standards for the provision of adequate medical care to detainees.

112. As a result of these deficient policies, practices, and customs, Ms. Saldivar was denied life-saving medical care. Despite her repeated and urgent requests for medical attention, Leavenworth County and Synergy failed to:

   a) Provide or facilitate timely access to medical care;

   b) Ensure that qualified personnel assessed, treated, or monitored her condition; and

   c) Ensure that qualified personnel took necessary measures to address her severe symptoms, including pain, dehydration, and inability to urinate.

113. Defendants Leavenworth County and Synergy's conduct led directly to Ms. Saldivar's deprivation of constitutional rights and preventable death.

114. As a direct and proximate result of Leavenworth County and Synergy's conduct, E.D.H. has and will suffer mental anguish, suffering, bereavement, loss of society, companionship, comfort and protection of Raquel Lynn Saldivar, loss of attention, advice and counsel of Raquel Lynn Salvidar, and loss of parental care, training, guidance and education from Raquel Lynn Salvidar.

## Count II
### Violation of 42 U.S.C. § 1983 – *Deliberate Indifference*
### [against Individual Defendants]

115. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

116. At the time of her death, Ms. Saldivar was a pretrial detainee at Leavenworth County Jail.

117. The Individual Defendants were at all relevant times employed or contracted by Leavenworth County or Synergy or one of its contractors.

118. At all relevant times, the Individual Defendants were acting under color of state law and were responsible for responding to Ms. Saldivar's medical needs while she was in custody at the Leavenworth County Jail.

119. While at Leavenworth County Jail, Ms. Saldivar had a medical emergency stemming from her withdrawal from opiates.

120. Ms. Saldivar's medical needs—which included obvious physical distress over a period of at least hours, as well as difficulty walking, difficulty breathing, and ultimately loss of consciousness in the presence of some of the Individual Defendants—were so obvious that Individual Defendants did or should have recognized the necessity for a doctor's attention.

121. The Individual Defendants had actual knowledge that a substantial risk of serious harm existed related to Ms. Saldivar's ongoing medical distress from her withdrawal from opiates.

122. Despite Ms. Saldivar's repeated requests for help and her worsening condition, the Individual Defendants disregarded the substantial risk of serious harm to Ms. Saldivar by:

a) Ignoring Ms. Saldivar's requests for medical assistance;

b) Failing to monitor or assess her deteriorating condition;

c) Taking no steps to escalate her case to higher-level providers or transport her to a hospital; and

d) Allowing her to remain in a state of severe medical distress, culminating in her death.

123. Nurse Wardrop acted with deliberate indifference to Ms. Saldivar's serious medical needs by providing Ms. Saldivar with inadequate medical care even after Nurse Wardrop was presented with recognizable symptoms that created a medical emergency on multiple occasions in Ms. Saldivar's final hours.

124. Officer Douthitt, Officer Schneider, and Deputy Leintz, acted with deliberate indifference to Ms. Saldivar's medical needs after they witnessed Ms. Saldivar's obvious medical distress, including loss of consciousness, but failed to take measures to prevent further harm or provide emergency medical intervention.

125. It would be clear to a reasonable officer or medical professional that the Individual Defendants' conduct was unlawful in the situation they confronted.

126. These acts and omissions demonstrated a wanton, reckless or callous disregard for Ms. Saldivar's constitutional rights, leading to her preventable pain, suffering, and death.

127. As a direct and proximate result of the Individual Defendants' deliberate indifference, Ms. Saldivar's constitutional rights were violated, causing her death.

128. The Individual Defendants are not entitled to the protection of qualified immunity.

129. As a direct and proximate result of Individual Defendants' conduct, E.D.H. has and will suffer mental anguish, suffering, bereavement, loss of society, companionship, comfort and protection of Raquel Lynn Saldivar, loss of attention, advice and counsel of Raquel Lynn Salvidar, and loss of parental care, training, guidance and education from Raquel Lynn Salvidar.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment be entered in her favor against Defendants for compensatory damages in excess of $75,000, for punitive damages, for attorneys' fees and expenses, for punitive damages, for interest, and for any other relief the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiff requests a jury trial on all issues so triable.

Respectfully submitted,

/s/ *Brian J. Madden*
Brian J. Madden    KS #15897
Zachery E. Galyon    KS #30425
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel. (816) 701-1100/Fax (816) 531-2372
bmadden@wcllp.com
zgalyon@wcllp.com
**ATTORNEYS FOR PLAINTIFF**